797 F.2d 1530
 55 USLW 2085, 21 Fed. R. Evid. Serv. 123,
Prod.Liab.Rep.(CCH)P 11,066
 Francis Paul JOHNSON, Plaintiff-Appellee-Cross-Appellant,
v.
COLT INDUSTRIES OPERATING CORPORATION, a Delaware
corporation, Defendant- Appellant-Cross-Appellee.
 Nos. 85-1922, 85-2006.
 United States Court of Appeals,
Tenth Circuit.
 July 28, 1986.
Rehearing Denied Oct. 2, 1986 in No. 85-1922.
 
 A.B. Conant, Jr. (John T. Helm and Mark J. Zimmerman of Shank, Irwin & Conant, Dallas, Tex., George A. Lowe and Christopher Bacon of Lowe, Terry & Roberts, Olathe, Kan., with him on briefs), for defendant-appellant-cross-appellee.
 Victor A. Bergman (John E. Shamberg and Cathy A. Sayles of Shamberg, Johnson, Bergman & Goldman, Shawnee Mission, Kan., with him on briefs), for plaintiff-appellee-cross-appellant.
 Before McKAY, SETH and TIMBERS,* Circuit Judges.
 TIMBERS, Circuit Judge.
 
 
 1
 Colt Industries Operating Corporation ("appellant") appeals from a judgment entered January 18, 1985 upon a jury verdict in favor of Francis Paul Johnson ("appellee") in the District of Kansas, Dale E. Saffels, District Judge. The jury found appellant liable for the injuries sustained by appellee and his wife when his handgun manufactured by appellant accidently discharged after being dropped. The jury awarded appellee $850,000 in compensatory damages and $1,250,000 in punitive damages. We find that the principal questions appellant raises on appeal are: (1) whether the district court erred in admitting in evidence a judicial opinion as proof of a similar accident; (2) whether the district court properly instructed the jury on the parties' respective duties of care; and (3) whether the evidence presented a jury question on punitive damages.[1]
 
 
 2
 For the reasons stated below, we affirm the judgment of the district court.[2]
 
 I.
 
 3
 We summarize only those facts believed necessary to an understanding of the issues raised on appeal.
 
 
 4
 In May 1974 appellee purchased a .22 caliber Colt single action revolver from a gun store near his home town of Junction City, Kansas. The gun had been manufactured by appellant in 1969 and sold to the gun store in that year. The gun model was the famous Colt "six-shooter", first produced by appellant in 1873. The gun model has achieved a certain notoriety as a result of its association with the Old West and the United States Army. Appellant has not altered the design of the gun model significantly since its inception. The gun has a revolving cylinder with six chambers that accept six bullets. The gun has an exposed hammer that must be cocked manually before each shot is fired. Appellee, an experienced handler of guns, testified that he purchased the gun for personal protection.
 
 
 5
 On July 31, 1981 appellee took the gun with him on a fishing trip to a nearby creek. While appellee was seated on a rock in the creek the gun fell from its holster and struck the rock. The impact caused the gun to discharge. The bullet entered appellee's right buttock and lodged in his bladder. Although surgery was successful in removing the bullet, appellee's doctor testified that the bullet had traumatized certain nerves and rendered appellee permanently impotent. Appellee and his wife testified to the detrimental effect this injury had on their marriage and appellee's life in general.
 
 
 6
 Why the gun fired upon impact was not in question. Both parties' expert witnesses testified that exposed hammer single action revolvers expose the user to a hazard known as "drop-fire". Drop-fire occurs when the gun is carried with a bullet in the chamber over which the hammer rests. In this situation, regardless of the cock position of the hammer, a sharp blow to the hammer, such as when the gun is dropped and lands hammer first, will cause the gun to discharge. When appellee's gun discharged, all six chambers were loaded but the hammer was uncocked.
 
 
 7
 On May 12, 1982 appellee commenced the instant diversity action in the district court. Appellee alleged that appellant was liable for his injuries because of the defective design of the gun. The complaint sounded in negligence, strict products liability and breach of warranty. Appellee's theory of the case was that the gun was unreasonably dangerous when fully loaded because of the drop-fire hazard.
 
 
 8
 The case was tried before Judge Saffels and a jury from January 7 to January 18, 1985. Viewing the evidence in the light most favorable to appellee, as we must, appellee established through expert testimony that the design of the gun rendered it unsafe in any hammer position if the gun was carried with a bullet in the chamber under the hammer. The evidence showed that, even if the hammer was in the "safety" position when fully loaded, a sharp blow to the hammer would cause the gun to discharge. Appellee's expert also testified that the gun design was unreasonably dangerous because there were certain inexpensive "positive" safety devices which could have been built into the gun to prevent any drop-fire. Appellee also introduced certain patent records for such safety devices, including one patented by appellant's founder in 1850. These records indicated an industry awareness of the drop-fire hazard and feasible alternatives for curing it. Appellant's own experts testified that gun manufacturers were aware of the drop-fire hazard and "ought" to consider it when designing exposed hammer weapons.
 
 
 9
 Appellee, aside from testifying to the circumstances of the accident and the profound effect his injuries had on his family, also testified that he had not received any instructions for the gun when he purchased it. Appellant introduced the instructions it includes with the gun model. The instructions do state that "the safest way to carry your [gun] is with five cartridges in the chamber and the hammer on the sixth chamber". Another portion of the instructions, however, states "load each chamber". Appellee also introduced extensive evidence of the gun's image as a "six-shooter". Finally, there was a good deal of conflicting evidence on appellant's knowledge of other drop-fire related accidents. One of appellant's officers admitted under cross-examination to being aware of a "few" drop-fire related accidents over the last five or six years. The officer denied knowledge of any law suits arising from these accidents. Appellee, however, introduced, over objection, the opinion of the Missouri Court of Appeals in Bender v. Colt Industries, Inc., 517 S.W.2d 705 (Mo.Ct.App.1974). In Bender the court upheld a jury verdict of $15,000 for a plaintiff who had been shot in the head when his gun, the same Colt model as appellee's, discharged after being dropped.
 
 
 10
 The jury in the instant case returned a verdict finding appellant 85% liable for appellee's injuries, the gun store 5% liable, and appellee 10% liable. The jury awarded appellee and his wife each $500,000 in compensatory damages. The jury also awarded appellee $1,250,000 in punitive damages. The district court denied appellant's motion for a new trial, but reduced the compensatory damage award to $850,000 to reflect appellant's 85% liability. The court upheld the punitive damage award. 609 F.Supp. 776 (D.Kan.1985). These appeals followed.
 
 II.
 
 11
 Appellant has raised a number of claims of error in support of its request for a new trial. We shall address the principal claims seriatim.
 
 A. Admission of the Bender Opinion
 
 12
 Appellant argues that the district court erred in admitting as substantive evidence the Missouri Court of Appeals opinion in Bender v. Colt Industries, Inc., 517 S.W.2d 705 (Mo.Ct.App.1974). Appellant contends that judicial opinions are per se inadmissible or at least that admitting Bender was unfairly prejudicial. While we agree that the admission of the opinion was error, we hold that it was harmless error.
 
 
 13
 The Bender opinion was offered as proof of appellant's knowledge of accidents similar to appellee's and the propensity of the gun model to drop-fire. We have held that evidence of similar accidents involving the same product is admissible under both Kansas strict products liability law and federal law to establish "notice, the existence of a defect, or to refute testimony given by a defense witness that a given product was designed without safety hazards." Rexrode v. American Laundry Press Co., 674 F.2d 826, 829 n. 9 (10th Cir.), cert. denied, 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982). We also have held that evidence of similar accidents is admissible to show primary negligence in an appropriate case. Julander v. Ford Motor Co., 488 F.2d 839, 846-47 (10th Cir.1973). Clearly, the Bender opinion was relevant to both appellee's strict liability and negligence theories. Likewise, the evidence was highly relevant to impeach the credibility of appellant's officer who testified to not being aware of any drop-fire related law suits involving this very same model Colt revolver. Moreover, evidence of similar prior accidents was relevant in showing the indifference toward a known risk essential to appellee's punitive damage claim.
 
 
 14
 A foundational requirement for the admission of similar accident evidence is that the proffered accidents be substantially similar to the accident at bar. Julander, supra, 488 F.2d at 845-47. In the instant case, there is little doubt that the Bender accident was substantially similar to appellee's accident. In Bender the plaintiff accidentally dropped the same model Colt single action revolver[3] from his pocket onto a concrete apron. The hammer of the gun struck the concrete and the gun, being fully loaded, discharged, even though the hammer was in the "safety" position. This is exactly what happened in the instant case. While it is true that there was the additional evidence in the Bender case of a part of the trigger breaking off on impact, that distinction does not detract from the case's relevance in showing appellant's awareness of the drop-fire hazard and its consequences.
 
 
 15
 To hold that the Bender opinion's similar accident evidence was relevant, however, does not validate the form in which that evidence was admitted. While we can find no authority squarely in point--one way or the other--we believe that the admission of a judicial opinion as substantive evidence presents obvious dangers. The most significant possible problem posed by the admission of a judicial opinion is that the jury might be confused as to the proper weight to give such evidence. It is possible that a jury might be confused into believing that the opinion's findings are somehow binding in the case at bar. Put most extremely, the jury might assume that the opinion is entitled to as much weight as the trial court's instructions since both emanate from courts.
 
 
 16
 To minimize these dangers and in light of the fact that similar accident evidence can be adduced in numerous other ways,[4] a judicial opinion should be admitted as substantive evidence of a similar accident only in the rarest of cases when no other form of evidence is available and then only with detailed limiting instructions. In the instant case there appears to have been no reason why evidence of the Bender accident and the subsequent successful lawsuit (from the plaintiff's standpoint) could not have been adduced in another form. We hold, therefore, that the admission of the opinion was error.
 
 
 17
 This holding, however, does not end our inquiry. Fed.R.Civ.P. 61 cautions us not to disturb a judgment because of an error in the admission of evidence unless a refusal to upset the judgment would be "inconsistent with substantial justice."[5] The admission of the Bender opinion, in our view, is a particularly appropriate candidate for harmless error analysis. The opinion represented only a small part of appellee's evidence. Appellee's expert testimony appears to have dominated his case-in-chief and was extremely probative evidence. Appellee's experts not only testified to the distinct likelihood of drop-fire accidents in view of the gun's design, but they also testified to the unreasonable dangerousness of this design defect in view of the availability of inexpensive positive safety devices. This testimony was buttressed by evidence of the patents for such positive safety devices, and the existence of other gun models, including some made by appellant, which used these devices. Appellant's experts could not rebut this evidence, and ended up admitting the possibility of drop-fire accidents because of the gun's design. This overwhelming evidence of unsafe design greatly diminished the possible prejudicial effect of the Bender opinion. Moreover, the thrust of appellant's defense--that appellee failed to follow the instructions--further mitigated the possible prejudice from the opinion. While the Bender opinion may have helped the jury to decide that the gun model was likely to drop-fire, appellant really did not challenge this assertion as much as it argued that it warned users of the risk. The Bender opinion does not discuss appellant's efforts to warn consumers of the drop-fire risk and could not have prejudiced the jury on this crucial issue. Finally, it is significant that appellant's trial counsel made only a general objection to the admission of the opinion and later refused the court's offer to give appropriate limiting instructions to the jury. Counsel, having resorted to understandable "trial strategy", cannot complain of what he now perceives as the pervasive prejudicial effect of the opinion when at trial he was willing to gamble on an all or nothing objection.
 
 
 18
 In the last analysis, we agree with the district court that the jury was not overly impressed with the Bender opinion. The jury's special verdict indicates that it carefully considered and apportioned liability among the three parties involved. Both the disparity in the respective fault percentages and the size of the award indicate that the jury did not consider the case an especially close one. We cannot say that the jury permitted the Bender opinion to control the outcome of the instant case and thereby deny appellant substantial justice.
 
 
 19
 We hold that the admission of the Bender opinion was harmless error.
 
 B. Duty of Care
 
 20
 Appellant argues that the district court erred in instructing the jury on appellant's duty of care in designing and manufacturing the gun. The court charged the jury in relevant part:
 
 
 21
 "A manufacturer of firearms has the duty to exercise the highest degree of care in the design of the product so that it will be reasonably safe for the use for which it was intended or which can reasonably be anticipated. Failure to fulfill this duty constitutes negligence."
 
 
 22
 Appellant claims that it should have been held only to a duty of reasonable care and not to the "highest degree of care". This claim is without merit.
 
 
 23
 In Kansas, as in most states, one who engages in dangerous activities is held to a higher standard of care to avoid negligence liability. E.g., Wroth v. McKinney, 190 Kan. 127, 373 P.2d 216 (1962) (use of explosives requires highest duty of care). It requires little imagination to include gun manufacturing in this category of dangerous activities. The court's instruction therefore fairly stated Kansas negligence law. Likewise, in a recent strict products liability case the Kansas Supreme Court stated that "we also think that the duty of the manufacturer must be commensurate with the seriousness of the danger. The greater the danger, the greater the duty." Wooderson v. Ortho Pharmaceutical Corp., 235 Kan. 387, 417, 681 P.2d 1038, 1062, cert. denied, --- U.S. ----, 105 S.Ct. 365, (1984) (birth control pill manufacturer). The court's instruction therefore also tracked Kansas strict products liability law. It is entirely reasonable to believe that the Kansas courts would hold the manufacturers of deadly hand guns to the most exacting duty of care.
 
 
 24
 We hold that the court properly instructed the jury on appellant's duty of care.
 
 
 25
 Appellant also argues that the court erred in instructing the jury on appellee's duty of care in handling the gun. The court charged the jury in relevant part:
 
 
 26
 "One who has in his possession, or under his control, an instrumentality exceptionally dangerous in character is bound to take exceptional precautions to prevent an injury being done by the instrumentality. The degree of care must be equal to the degree of danger involved."
 
 
 27
 Appellant claims that this instruction did not place a stringent enough duty of care on appellee. This claim also is without merit.
 
 
 28
 We are at somewhat of a loss to understand appellant's problem with the instruction. The court obviously placed an "exceptional" duty of care on appellee. We cannot envision a more exacting duty of care short of presumed contributory negligence. Appellant's semantic argument borders on the frivolous.
 
 
 29
 We hold that the court properly instructed the jury on appellee's duty of care.
 
 C. Punitive Damages
 
 30
 Appellant argues that the district court erred in allowing the question of punitive damages to go to the jury. Appellant contends that its use of a "warning" in the gun's instructions foreclosed the imposition of punitive damages as a matter of law. Appellant has sought to bolster this argument with some authority from other circuits which suggest that the use of a warning precludes a finding of the culpable conduct required to impose punitive damages. We are unpersuaded.
 
 
 31
 Sitting in diversity, we are bound by Kansas substantive law. Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). Appellant's arguments based on what non-Kansas courts have done, therefore, are largely beside the point. In Kansas a plaintiff is entitled to have the jury consider his punitive damage claim if any reasonable view of the evidence would support an award of punitive damages. Wooderson, supra, 235 Kan. at 416, 681 P.2d at 1062. In reviewing a trial court's submission of the question of punitive damages to the jury we must ask "whether, viewed in the light most favorable to the plaintiff, there is evidence from which a jury could have found the defendant to be grossly negligent or recklessly indifferent to the rights of others." Id. See also Henderson v. Hassur, 225 Kan. 678, 694, 594 P.2d 650, 663 (1979) (punitive damages are appropriate on a showing that the defendant acted maliciously or with wanton indifference to the rights of the plaintiff). Proof of reckless or wanton indifference requires evidence that the defendant "realized the imminence of injury to others from his acts and ... refrained from taking steps to prevent injury because indifferent to whether it occurred or not." Atkinson v. Orkin Exterminating Co., Inc., 5 Kan.App.2d 739, 747, 625 P.2d 505, 511, aff'd, 230 Kan. 277, 634 P.2d 1071 (1981) (adopting opinion of court of appeals), quoting Allman v. Bird, 186 Kan. 802, 806, 353 P.2d 216, 219 (1960).[6]
 
 
 32
 In view of these guidelines, we hold that the evidence in the instant case established a jury question on punitive damages. While there was no evidence to suggest that appellant was malicious in acting or failing to act, there was abundant evidence from which the jury could have concluded that appellant acted with reckless indifference in not implementing more effective safety devices in light of the known risk of drop-fire. First, the evidence clearly established that appellant from a very early date was or should have been aware of the risk of drop-fire in exposed hammer revolvers. Not only did both parties' experts testify to the general industry awareness of the drop-fire hazard and the likelihood that guns would be dropped inadvertently in normal use, but appellee's patent application evidence going back to 1850 also illustrated the attempts of gun manufacturers, including appellant, to cure the drop-fire hazard. One of appellant's officers also admitted knowing of a few drop-fire related accidents. The jury could have concluded, then, that appellant was aware of the drop-fire hazard at all relevant times, from manufacture in 1969 to the accident itself in 1981.
 
 
 33
 Second, the jury could have viewed the steps appellant took to alleviate this deadly risk as trifling at best. Appellant's only attempt to lessen the risk was the single statement in the gun's instructions that "the safest way to carry your [gun] is with five cartridges in the chamber and the hammer on the sixth chamber". While appellant terms this statement a "warning", it is evident that the statement neither describes the risk involved nor warns of the possible consequences. Moreover, the same instructions also advise the consumer to "load each chamber" and that the gun will not fire unless the hammer is manually cocked. Coupled with these equivocal instructions was the gun's image as a "six-shooter", which implies that all six chambers may be loaded safely. From this evidence the jury properly could have found that, not only had appellant not adequately warned of the risk of drop-fire, but it had acted indifferently in the face of a known and deadly risk. Likewise, appellant's justification for not taking more effective steps--that installing a positive safety device would detract from the gun's image as a throwback to the Old West--could have been viewed by the jury as putting marketing concerns ahead of safety concerns. See Wooderson, supra, 235 Kan. at 415, 681 P.2d at 1062 (punitive damages properly awarded when evidence suggested that drug manufacturer put sales concerns ahead of safety concerns).
 
 
 34
 In short, we hold that the evidence raised a jury question of whether appellant acted with reckless indifference to the drop-fire design hazard. The answer to that question, as well as the amount of the punitive damage award, was properly left to the jury.[7]
 
 III.
 To summarize:
 
 35
 We affirm the judgment of the district court holding appellant liable for appellee's injuries and assessing punitive damages against appellant. We hold that, while the admission of the Bender opinion was error, it was harmless error in light of the other evidence of an unreasonably dangerous design defect and the precision of the jury's verdict. We also hold that the court properly instructed the jury on the parties' respective duties of care under Kansas law, holding each party to the highest standard. Finally, we hold that the evidence established a jury question on the appropriateness of punitive damages, since it is appropriate to view the evidence as showing that appellant acted with reckless indifference in the face of the known and deadly risk of drop-fire. Kansas tort law provides a remedy and a punishment for unreasonably dangerous defectively designed products that injure consumers while in normal use. Since appellee convinced a properly instructed jury of the gun's defective design and appellant's indifference to the known risk of drop-fire, the judgment must stand.
 
 
 36
 AFFIRMED.
 
 McKAY, Circuit Judge, concurring:
 
 37
 I agree with the opinion of the court except for its harmless error analysis. Admitting into evidence the full opinion in Bender v. Colt Industries, Inc., 517 S.W.2d 705 (Mo.Ct.App.1974), was certainly prejudicial. But the opinion was also extremely probative; it gave almost irrefutable proof that Colt had notice of the "drop-fire" hazard caused by its pistols in face of Colt's denial that it had notice. Thus, the trial court should have admitted it only after reducing its potential for prejudice through use of a limiting jury instruction or by editing the opinion. See Fed.R.Evid. 105.
 
 
 38
 Nevertheless, I reject Colt's argument that admission of the Bender opinion was reversible error. Colt declined the opportunity to request a limiting jury instruction regarding the Bender opinion. Instead, it submitted an all-or-nothing objection to the admission of the opinion. Colt also failed to submit specific requests that the most prejudicial portions of the opinion be excised. Colt simply did not give the trial court the option of admitting this key and very probative evidence in a form that would have minimized its prejudicial impact. I believe this failure to propose a limiting instruction or to request deletions from the opinion is damning. Because "[a]n appellant may not complain on appeal of errors which he himself induced or invited," Neu v. Grant, 548 F.2d 281, 287 (10th Cir.1977), I agree with the majority opinion in its refusal to overturn the verdict based on the admission of the Bender opinion.
 
 
 
 *
 Of the Second Circuit, by designation
 
 
 [1]
 Appellant also argues that the district court erred in instructing the jury on the possibility of a product recall. We find, however, that the complained of instruction did no such thing. Appellant's argument is without merit
 
 
 [2]
 Appellee has cross-appealed from certain evidentiary rulings made by the district court but has asked that we reach the cross-appeal only if we were to remand the case for a new trial. In view of our decision on the principal appeal, we dismiss the cross-appeal without deciding it
 
 
 [3]
 The caliber of the two guns was different, but that difference is irrelevant to the drop-fire hazard
 
 
 [4]
 The typical and preferable method of introducing such evidence is through the testimony of one familiar with the similar accident or the subsequent litigation. See Rexrode, supra, 674 F.2d at 829 (similar accident evidence admitted through testimony of expert who had investigated the similar accidents)
 
 
 [5]
 Rule 61 also admonishes us to disregard any error "which does not affect the substantial rights of the parties."
 
 
 [6]
 We note and hold that, contrary to appellant's arguments, the district court correctly instructed the jury on the prerequisites for awarding punitive damages under Kansas law
 
 
 [7]
 While an award of $1,250,000 may be said to be a large one, we cannot say that the amount "shocks the conscience of the appellate court", in view of the deadly nature of the drop-fire hazard and appellant's large sales volume of the gun model at issue. See Cantrell v. R.B. Werner Co., 226 Kan. 681, 686, 602 P.2d 1329, 1333 (1979). Moreover, appellant makes no claim before us that the punitive damage award was excessive. Its appellate counsel appears to have resorted to understandable "appellate strategy" and to have gambled on an all or nothing claim with respect to the punitive damage award--much as its trial counsel did with respect to the admission of the Bender opinion. Supra, p. 1535